So Ordered.

Dated: March 31, 2022



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Juan Sandoval,

Case No. 21-24190-gmh
Chapter 13

Debtor.

**DECISION AND ORDER**

Reverse Mortgage Funding LLC objects to confirmation of the chapter 13 plan, contending that the plan must pay its claim in full. As explained below, the plan need not provide for full payment of Reverse Mortgage's claim, so the objection is overruled.

I

The following facts are uncontested. The debtor's mother died in December 2020. He inherited from her a duplex located at 2533-2535 West Juneau Avenue, Milwaukee, Wisconsin. He currently resides there. His sister rents the duplex's other unit from him.

A mortgage on the duplex secures repayment obligations under a home equity conversion note executed in September 2008 by the debtor's mother, whom this decision and order will refer to as the "borrower." See Claim No. 2, at 9, 11 & 14. The note is nonrecourse, meaning the borrower was not personally liable on it and the note

holder can only collect by foreclosing its interest in the property. Reverse Mortgage, which now holds the note and mortgage, filed a proof of claim alleging that it has a claim for $153,812.43 secured in full by the property. Claim No. 2.

The debtor's chapter 13 plan proposes treatment of Reverse Mortgage's claim in three main parts. First, the plan provides for bifurcation of the claim into a $45,000 secured claim—based on a May 2021 appraisal of the duplex, ECF No. 1, at 10—and an unsecured claim for the remainder (nearly $109,000). ECF No. 2, at 4. Second, the plan proposes to pay the secured claim in full, with interest at 4.75%, over about 60 months, but to pay nothing on the unsecured claim (and any other allowed nonpriority unsecured claims). *Id.* at 4–5. Third, the plan states that "the mortgage shall be satisfied" after the debtor completes all payments under the plan, including "payment of [Reverse Mortgage's] allowed secured claim", and is granted a discharge. *Id.* at 7.

Reverse Mortgage objects to confirmation of the plan, principally contending that the proposed treatment of its claim violates 11 U.S.C. §1322(b)(2)'s "anti-modification" clause, which prohibits a chapter 13 plan from modifying the rights of a holder of a claim secured only by a mortgage on the debtor's principal residence. As a result, Reverse Mortgage argues, the plan does not comply with the provisions of chapter 13, which is a requirement for confirmation of a chapter 13 plan, 11 U.S.C. §1325(a)(1).

The debtor responds that (1) the anti-modification clause does not apply because the property is not solely his principal residence, but is instead a mixed-use, income-producing duplex, and (2) even if the anti-modification clause would otherwise apply, the plan can modify Reverse Mortgage's rights under §1322(c)(2)—a statutory exception to the anti-modification clause that applies when the last payment on a claim was originally due before the last payment under the plan is due—because the note became due and payable in full when his mother died.

II

Section 1322(b)(2)—subject to §1322(a) & (c), and with the anti-modification clause in bold—permits a chapter 13 plan to "modify the rights of holders of secured claims, **other than a claim secured only by a security interest in real property that is the debtor's principal residence**, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims". There is no dispute that Reverse Mortgage holds a claim secured by a security interest in real property of the debtor.[1] Nor is there any dispute that the debtor principally resides in the real property in which Reverse Mortgage has a security interest. The parties dispute only whether that real property "*is* the debtor's principal residence" despite also being an income-producing rental property. §1322(b)(2) (emphasis added).

A

To decide whether §1322(b)(2)'s anti-modification provision applies one must begin with its text. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012); *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). The Bankruptcy Code defines "debtor's principal residence" in relevant part as "a residential structure if used as the principal residence

---

[1] Reverse Mortgage has a mortgage on the debtor's duplex, so it has a "claim", a "lien", and a "security interest", as those terms are defined in the Bankruptcy Code. See *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991) (holding that, even without "a debtor's personal liability", "a mortgage interest . . . is a 'claim'" for purposes of the Bankruptcy Code because "the mortgage holder" has "a 'right to payment' in the form of its right to the proceeds from the sale of the debtor's property" (quoting 11 U.S.C. §101(5) (defining "claim"))); §101(37) & (51) (defining a "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation" and a "security interest" as a "lien created by an agreement"); see also *id.* §102(2) (providing that a "'claim against the debtor' includes [a] claim against property of the debtor"); *id.* §506(a) (providing that "[a]n allowed claim . . . secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of [the] creditor's interest in the estate's interest in [the] property").

of the debtor, including incidental property". 11 U.S.C. §101(13A)(A).[2] And the Code defines "incidental property", "with respect to a debtor's principal residence", as "property commonly conveyed with a principal residence in the area where the real property is located", including, among other things, "all easements, rights, appurtenances, [or] fixtures" and "all replacements or additions." §101(27B)(A)–(C).[3] The result is that a chapter 13 plan cannot modify the rights of the holder of a claim secured only by a security interest in "a residential structure" that the debtor uses as his "principal residence", including "property commonly conveyed with a principal residence in the area where the real property is located". §101(13A)(A) & (27B)(A).

Reverse Mortgage's claim is secured by a mortgage—which is a security interest, see §101(51)—in the duplex, granting it the right to collect on any debts governed by the home equity conversion note from the property, identified by its legal description, "together with all the improvements now or hereafter erected on the property, . . . all easements, rights, appurtenances, and fixtures now or hereafter a part of the property", and "[a]ll replacements and additions". Claim No. 2, at 14. The debtor does not contend that Reverse Mortgage's claim is secured by any other interest in any other property. And the debtor does not dispute that he uses as his principal residence a residential structure that is an improvement erected on the property. See ECF No. 1, at 2 (stating, on his bankruptcy petition, that he lives at "2533 W. Juneau Ave." in "Milwaukee, WI"). Reverse Mortgage's claim therefore seems obviously to be one "secured only by a security interest in real property that is the debtor's principal residence". §1322(b)(2).

---

[2] Section 101(13A)(A) goes on to clarify that the "residential structure" need not be "attached to real property". The remainder of §101(13A) provides that "debtor's principal residence" expressly "includes an individual condominium or cooperative unit, a mobile or manufactured home, or trailer if used as the principal residence by the debtor." §101(13A)(B).

[3] The Bankruptcy Code's definition of "incidental property" also includes "all . . . rents, royalties, mineral rights, oil or gas rights or profits, water rights, escrow funds, or insurance proceeds". §101(27B)(B).

B

The debtor, however, contends that Reverse Mortgage's claim does not fall within the scope of §1322(b)(2)'s anti-modification clause because it is secured by a security interest in a duplex, and he only resides in half of it, while his sister rents and occupies the other half. He argues that, as a result, the claim is not secured by a security interest in real property that *is* his principal residence, but instead by real property that merely *includes* his principal residence. Rights arising from a claim secured by a security interest in such a "mixed use" property, the argument goes, are not protected by the anti-modification clause. See ECF No. 24, at 3; see also, e.g., *Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough)*, 461 F.3d 406, 411 (3d Cir. 2006) ("By using the word 'is' in the phrase 'real property that *is* the debtor's principal residence,' Congress equated the terms 'real property' and 'principal residence.' Put differently, this use of 'is' means that the real property that secures the mortgage must *be only* the debtor's principal residence in order for the antimodification provision to apply.").

The debtor's argument fails because he eschews the Bankruptcy Code's text, relying instead on case law. He concedes that "[c]ourts are split on whether 11 U.S.C. § 1322(b)(2) prohibits the modification of claims secured by mixed-use real estate" but nevertheless asks this court to align with "[s]everal courts" that "have ruled that it does not prohibit modification and adopt the 'residential use only' approach followed by" the First and Third Circuits. ECF No. 24, at 3 (citing *Lomas Mortg., Inc. v. Louis*, 82 F.3d 1 (1st Cir. 1996), and *Scarborough*, 461 F.3d 406); see also *In re Krus*, 582 B.R. 218, 220 & n.1 (Bankr. W.D. Wis. 2018) ("Overwhelmingly, courts have held that claims secured by mixed-use property are not 'secured by a debtor's principal residence' for purposes of section 1322."); *In re Colcord*, No. 15-46941, 2015 WL 5461543, at *3–4 (Bankr. E.D. Mich. Sept. 16, 2015) (concluding that the anti-modification clause did not apply to a claim secured by a security interest in a duplex containing the debtor's principal residence).

None of these decisions are binding on this court, however. The leading cases for the "residential use only" approach—the First Circuit's 1996 *Lomas* decision and the Third Circuit's 2006 *Scarborough* decision—both construed the anti-modification clause without regard to §101's definitions of "debtor's principal residence" and "incidental property", which were added in 2005. See Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, §306(c), 119 Stat. 23, 80–81; see also *Scarborough*, 461 F.3d at 412 n.2 (explaining that, "[b]ecause Scarborough commenced the . . . case . . . prior to the[] effective date" of the Bankruptcy Abuse Prevention and Consumer Protection Act, "these statutory definitions d[id] not apply" and "leav[ing] for another day the question of whether, or how, the . . . Act altered the scope of the anti-modification provision of § 1322(b)(2)"). In subsequent decisions, courts have often elected to follow *Scarborough*'s lead without addressing the effect, if any, of the 2005 Act's definitions. See, e.g., *Krus*, 582 B.R. at 220. Others stayed the course by "reject[ing] the suggestion that these definitions, when combined and inserted into § 1322(b)(2), cure the ambiguity in the anti-modification clause" identified in cases like *Lomas*. E.g., *Pawtucket Credit Union v. Picchi (In re Picchi)*, 448 B.R. 870, 875 (B.A.P. 1st Cir. 2011).

And several other decisions support the conclusion that §1322(b)(2)'s anti-modification clause unambiguously applies to Reverse Mortgage's claim. See, e.g., *In re Addams*, 564 B.R. 458, 464–66 (Bankr. E.D.N.Y. 2017) (describing varied approaches that courts have taken to interpreting §1322(b)(2) and adopting "a so-called bright-line approach based on whether the real property includes the debtor's principal residence", under which "the anti-modification provision of § 1322(b)(2) applies so long as the debtor principally resides at the subject real property, even if the real property has other purposes"); *In re Brooks*, 550 B.R. 19, 24 (Bankr. W.D.N.Y. 2016) (concluding that if "the debtor principally resides in *some portion* of the real property, the anti-modification protection under § 1322(b)(2) applies" (footnote omitted)); see also *Wages v. J.P. Morgan Chase Bank, N.A. (In re Wages)*, 508 B.R. 161, 164–68 (B.A.P. 9th Cir. 2014) (construing

11 U.S.C. §1123(b)(5)'s anti-modification clause in an individual-debtor case under chapter 11, and adopting the "the bright-line approach" to the "identical wording in § 1322(b)(2)", under which "the anti-modification exception . . . applies to any property that is used as the debtor's principal residence," even if the property also has another use). These decisions applying a "bright-line approach" are more faithful to the Bankruptcy Code's post–2005 Act text.

III

As an alternative avenue to plan confirmation, the debtor looks to a statutory exception to §1322(b)(2)'s anti-modification clause: §1322(c)(2). Section 1322(c)(2) allows a chapter 13 plan to modify "a claim secured only by a security interest in real property that is the debtor's principal residence"—"[n]otwithstanding subsection (b)(2)"—if "the last payment on the original payment schedule for [the] claim . . . is due before the date on which the final payment under the plan is due". §1322(c)(2).

Reverse Mortgage objects that the last payment on the original payment schedule for its claim is due long *after* the date on which the final plan payment is due. The note provides, as Reverse Mortgage emphasizes, that "[a]ll amounts advanced . . . , plus interest, if not paid earlier, are due and payable on December 09, 2081", which is the only date certain set forth in either the note or the mortgage as the date on which the debt underlying the claim was to become due and payable in full. Claim No. 2, at 9. Reverse Mortgage reasons from this that December 9, 2081, must be the date on which the last payment on the original payment schedule for the claim is due. If Reverse Mortgage is right, then §1322(c)(2) does not permit the plan to modify the claim.

The debtor responds that §1322(c)(2) allows a plan to modify a claim that is for a debt that has come due in full by its own terms (rather than as the result of a default), as the debt to Reverse Mortgage did upon the death of the borrower, his mother. He emphasizes that the note and mortgage both provide for "immediate payment in full",

upon demand, upon the death of the borrower. *Id.* at 10 & 16.[4] Reverse Mortgage replies that the death of the borrower merely accelerated the maturity of the debt, which does not affect when the last payment on the *original* payment schedule for the claim is due. If the debtor is right, however, that the original payment schedule for Reverse Mortgage's claim ended when his mother died, which happened before he commenced this case, then the last payment on that schedule is necessarily due before the final payment under the plan is due, and §1322(c)(2) permits the plan to modify the claim.

A

The Bankruptcy Code does not define "original payment schedule", but the term's ordinary meaning—which governs absent a statutory definition, see *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 69 (2011)—is clear:

> Ordinarily, as used in § 1322(c)(2), the adjective "original" means "of or relating to a rise or beginning" or "existing from the start". . . . [and] the noun phrase "payment schedule" . . . means "a usu[ally] written plan or proposal for future procedure typically indicating the objective proposed" and "the time and sequence of each operation"—i.e., a "schedule"—for which the objective is "the discharge of a debt or an obligation" . . . .

*In re Tolliver*, No. 20-22408, 2020 WL 5869070, at *1 (Bankr. E.D. Wis. Sept. 28, 2020) (citations omitted) (alteration in original) (quoting *Webster's Third New International Dictionary* 1592, 1659, 2028 (2002)). In other words, "the 'original payment schedule' for a 'claim' is the first or earliest plan for paying off the debt, which is the 'liability on [the] claim'". *Id.* (quoting 11 U.S.C. §101(12)).

Given this definition, the question to be answered here is simply put: When the debt for which Reverse Mortgage holds a claim was first incurred, how and when in the

---

[4] Various terms of the note and mortgage suggest that there was more than one borrower. For example, the note and mortgage both provide for immediate payment in full if "[a] Borrower dies and the Property is not the principal residence of at least one surviving Borrower". Claim No. 2, at 10 & 16. But the note defines "Borrower" as "each person signing at the end of this Note", it is only signed by one person, and the mortgage expressly defines "Borrower" as the same person. *Id.* at 9, 11 & 14.

ordinary course was repayment required? To answer that question, the court looks to Wisconsin law on contract interpretation as it applies to the note and mortgage held by Reverse Mortgage.[5]

Under Wisconsin law, a court's "general task in contract interpretation is to determine and carry out the parties' intentions", which "are presumed to be expressed in the language of the contract." *Steadfast Ins. Co. v. Greenwich Ins. Co.*, 922 N.W.2d 71, 77 (Wis. 2019) (citations omitted). "Contract language is construed according to its plain or ordinary meaning, consistent with 'what a reasonable person would understand the words to mean under the circumstances'", and if appropriate, "in the manner in which it would be understood 'by persons in the business to which the contract relates.'" *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 866 N.W.2d 679, 685 (Wis. 2015) (footnote omitted)

---

[5] The Seventh Circuit has observed that "there is a tension as to whether bankruptcy courts follow federal common law choice-of-law principles or the forum state's choice-of-law principles", but it "has not reached the question", and the "courts of appeals that have reached the question have been divided." See *In re Jafari*, 569 F.3d 644, 648–49 (7th Cir. 2009). Whatever general tension exists in this area of law, for present purposes, the result is the same whether this court follows federal common law choice-of-law principles or those of the forum state, Wisconsin. In bankruptcy, "state law governs the validity of most property rights, and except when the bankruptcy code specifies otherwise, bankruptcy courts must apply the relevant state law." *Id.* at 648 (first citing *Butner v. United States*, 440 U.S. 48, 54 (1979); and then citing *In re Wright*, 492 F.3d 829, 832 (7th Cir. 2007)). Under Wisconsin law, "contract rights must be 'determined by the law of the [jurisdiction] with which the contract has its most significant relationship.'" *Id.* at 649 (alteration in original) (quoting *State Farm Mut. Auto. Ins. Co. v. Gillette*, 641 N.W.2d 662, 670–71 (Wis. 2002)). At issue here is a note by a Wisconsin resident in favor of a Wisconsin bank secured by a mortgage on Wisconsin property. See Claim No. 2, at 9–22; see also *M&I Marshall and Isley Bank*, FDIC (Mar. 18, 2022), https://banks.data.fdic.gov/bankfind-suite/bankfind/details/1020. The Bankruptcy Code does not specify rules of contract interpretation to be applied here; the relevant state law, for purposes of federal choice-of-law principles, is that of Wisconsin; and for purposes of Wisconsin law, Wisconsin is the jurisdiction with which the contract has its most significant relationship. Therefore, the court applies Wisconsin law in construing the note and mortgage. The parties did not address this issue—in fact, they did not cite *any* authority on contract interpretation from *any* jurisdiction—so the court deems forfeited any arguments they may have made that a source of law other than Wisconsin law governs the construction of the note and mortgage and any arguments arising therefrom, including for a different interpretative result under another source of law. Further, the parties did not address the impact (if any) of the mortgage's vague choice-of-law provision—which states that it "shall be governed by Federal law *and* the law of the jurisdiction in which the Property is located", which is Wisconsin, Claim No. 2, at 19 (emphasis added)—so any argument that this provision requires application of other legal principles has also been forfeited. See *Jafari*, 569 F.3d at 649 n.1.

(quoting *Seitzinger v. Cmty. Health Network*, 676 N.W.2d 426, 433 (Wis. 2004); and then quoting *Columbia Propane, L.P. v. Wis. Gas Co.*, 661 N.W.2d 776, 783 (Wis. 2003)).

In addition to these principles, a court construing a contract must consider any relevant statutes and regulations in force when the contract was made "because, in general, the laws in existence at the time of the contract are incorporated into that contract". *Dairyland Greyhound Park, Inc. v. Doyle*, 719 N.W.2d 408, 432 (Wis. 2006). Reverse Mortgage represents (and there appears to be no dispute) that the mortgage securing its claim is a "home equity conversion mortgage" within the meaning of 12 U.S.C. §1715z-20, a federal statute authorizing the Secretary of the U.S. Department of Housing and Urban Development (HUD) to insure certain mortgages for "elderly homeowners". See ECF No. 26, at 2–4; see also Claim No. 2, at 11 (referring to section 255 of the National Housing Act, which was created when Congress passed the Housing and Community Development Act of 1987, Pub. L. No. 100-242, §417(a), 101 Stat. 1815, 1908–12 (1988), and is codified as amended at 12 U.S.C. §1715z-20). As Reverse Mortgage explains, HUD's "Home Equity Conversion Mortgage Insurance program" is further governed by the regulations codified at 24 C.F.R. pt. 206.[6]

B

As explained above, Reverse Mortgage's assertion that the last payment on the original payment schedule for its claim is due on December 9, 2081—long after the final payment under the plan is due—depends on a provision of the note that states, "All amounts advanced by Lender, plus interest, if not paid earlier, are due and payable on December 09, 2081." Claim No. 2, at 9. This is the only date certain for repayment of the debt specified in either the note or the mortgage, so this construction has some intuitive appeal. It does not withstand scrutiny, however, because it ignores the note's other

---

[6] Consistent with Wisconsin law on contract interpretation, unless otherwise stated, all quotes from and references to any statute or regulation governing the home conversion mortgage insurance program are to those laws and rules as they existed when the note and mortgage were executed in September 2008.

provisions and the factors that Wisconsin law requires a court to consider when construing a contract, including the parties' intent as objectively manifested in their agreement and the statutory and regulatory backdrop in place when it was executed.

The objectively manifested intent of the parties to the note and mortgage was that the debt would be repaid upon the borrower's death or the sale of the mortgaged property. Paragraph 4 of the note, entitled "Manner of Payment", makes this clear. Claim No. 2, at 9. It unequivocally states that the borrower has "no personal liability for payment of the debt" and that the debt will be repaid "only through sale of the Property" upon the occurrence of an event specified "in Paragraph 7 of this Note." *Id.* Paragraph 7 sets forth two categories of events that trigger repayment: (1) "Death or Sale" and (2) "Other Grounds". *Id.* at 10. And unlike "Death or Sale", either of which permits the lender to proceed immediately against the mortgage property, the lender can only seek repayment of the debt on the specified "Other Grounds" with the "approval [of] an authorized representative of the Secretary [of HUD]". *Id.*

This reading of the note and mortgage—unlike Reverse Mortgage's contrary reading—is consistent with §1715z-20, subsection (j) of which expressly bars HUD from "insur[ing] a home equity conversion mortgage . . . unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary." Of the "other events" specified in HUD's regulations, none amount to the arrival of a specified date certain due to the ordinary passage of time. See 24 C.F.R. §206.27(c) ("*Date the mortgage comes due and payable.*").[7] At a

---

[7] HUD Handbook 4235.1 for the program—last issued, as revised, in November 1994—succinctly lists the characteristics of "a home equity conversion mortgage (HECM) or 'reverse mortgage'", one of which is, "[u]nlike a traditional 'forward' residential mortgage, which is repaid in periodic payments, a reverse mortgage is repaid in one payment, after the death of the borrower, or when the borrower no longer occupies the property as a principal residence", and another of which is, "[t]he HECM has neither a fixed maturity date nor a fixed mortgage amount." U.S. Dep't Hous. & Urban Dev., Handbook No. 4235.1

minimum, including a maturity date that could precede the borrower's death would have risked non-compliance with the rules of the home equity conversion mortgage program (and the resulting denial of HUD insurance), contrary to the clear intent of the parties to the note and mortgage.

Another requirement of §1715z-20 casts further doubt on the notion that the parties to the note and mortgage expected the debt to come due on the date specified in the note: HUD can insure a home equity conversion mortgage only if it was "executed by . . . an elderly homeowner", meaning a "homeowner who is, or whose spouse is, at least 62 years of age or such higher age as the Secretary may prescribe." §1715z-20(b)(1) & (d)(2)(A). If the borrower, whom the mortgage designates as unmarried, was at least 62 years old when she executed the mortgage at issue here, then she would have been at least 135 years old had she lived until December 9, 2081, which Reverse Mortgage asserts is the date on which the last payment on the original payment schedule is due. See Claim No. 2, at 14 & 21–22.

Indeed, Reverse Mortgage's own filings suggest that in September 2008, when she executed the note and mortgage, the borrower was nearly 77 years old, and that December 9, 2081, the date on which Reverse Mortgage insists the last payment on the original payment schedule for its claim is due, would have been her 150th birthday. Reverse Mortgage filed a document that evidences the transfer of the mortgaged property to the debtor from his mother's probate estate. ECF No. 26-1, at 1. That document, which was recorded with the Milwaukee County Register of Deeds, states, "The Decedent was born on 12/09/1931 . . . ." *Id.* Whether the record supports a finding of fact as to the borrower's age, though, the court need not make one. The objectively manifested intent of the borrower and the lender was to comply with the requirements

---

REV-1, *Home Equity Conversion Mortgages* ch. 1, para. 1–3 (1994), https://www.hud.gov/program_offices/administration/hudclips/handbooks/hsgh/4235.1.

of the home equity conversion mortgage program, which suggests both that the borrower was at least 62 years old when she executed the note and mortgage and that the parties did not expect to wait more than 73 years for the debt to be repaid, on or after December 9, 2081.

Why, then, does the note include a date certain for maturity? A likely reason is that "[s]ome state laws require legal obligations secured by a mortgage to specify a definite maturity date or term of repayment in the instrument." *Official Staff Interpretations of Regulation Z (Truth in Lending)*, 61 Fed. Reg. 14952, 14959 (Apr. 4, 1996) (codified as revised at 12 C.F.R. pt. 226 supp. I).[8] Where such a law might conflict with a federal regulation, a lender may include in the instrument "a definite maturity date" that is far enough in the future that it "would in no case operate to cause maturity prior to the occurrence of any of the events recognized in the regulation." *Id.*

HUD has long recognized that such a conflict might arise in its home equity conversion mortgage program and has, for decades, provided guidance to participating mortgagees about how to revise its model note and mortgage forms, without risking noncompliance with the program's rules, "[w]here state law requires that the mortgage documents provide a maturity date". U.S. Dep't Hous. & Urban Dev., Mortgagee Letter No. 90-17, *Home Equity Conversion Mortgage (HECM) Insurance Program Changes and Amendments to HUD Handbook 4235.1*, at 5 (May 29, 1990), https://www.hud.gov/program_offices/administration/hudclips/letters/mortgagee/1990ml. In such cases, HUD advises, referring to its forms, "[T]he introductory paragraphs of the first and second mortgage, and paragraph 2 of the first and second note may be amended to include a maturity date that is 50 years beyond the borrower's 100th birthday." *Id.*

---

[8] More broadly, under the Uniform Commercial Code, a note is a "negotiable instrument" only if, among other things, "[i]t is payable on demand or at a definite time." Wis. Stat. §403.104(1)(b), (2) & (5).

The note and mortgage at issue here closely resemble the "Model Adjustable Rate Note Form" and "Model Mortgage Form" that HUD provides in appendices to its handbook for the home equity conversion mortgage program. Compare Claim No. 2, at 9–11 & 14–21, with Handbook No. 4235.1 REV-1, at apps. 1 & 3. Notably, though, the note includes a maturity date in paragraph 2, precisely where HUD has, for decades, counseled that such a date be added to its model notes, notwithstanding the program's rules, if required by state law. See Claim No. 2, at 9; Mortgagee Letter No. 90-17, at 5. Moreover, as discussed above, the parties included in the note a maturity date of December 9, 2081, which seems to be exactly "50 years beyond" what would have been "the borrower's 100th birthday", consistent with HUD's direction. See Mortgagee Letter No. 90-17, at 5; Claim No. 2, at 9; ECF No. 26-1, at 1. All of this suggests that the parties included a maturity date in the note to satisfy some actual or perceived requirement of state law, but that they neither intended nor expected for the debt to be repaid then.

For these reasons, the inclusion in the note of a clearly nominal maturity date does not militate against concluding that the parties intended the underlying debt to be repaid upon the death of the borrower or the sale of the property. Tellingly, Reverse Mortgage offers no set of real-world circumstances under which repayment would await 2081, and the court cannot envision any.

C

Every bankruptcy court that has considered this issue—i.e., whether §1322(c)(2) permits a chapter 13 plan to modify a claim for a debt that is due because of the death of the borrower and secured by a "reverse mortgage", a broad category of security interests that includes home equity conversion mortgages insured by HUD, see Handbook No. 4235.1 REV-1, at ch. 1, para. 1–2 ("The program insures what are commonly referred to as reverse mortgages . . . .")—has reached the same conclusion. *In re Holmes*, No. 20-00484, 2020 WL 4730888, at *2 (Bankr. S.D. Miss. July 13, 2020); *In re Winstead*, No. 19-50307, 2019 WL 3491653, at *2 (Bankr. S.D. Miss. July 31, 2019); *In re*

*Michaud*, 548 B.R. 582, 584 (Bankr. S.D. Fla. 2016); *In re Harmon*, No. 15-BK-3407, 2015 WL 8249995, at *4 (Bankr. M.D. Fla. Dec. 2, 2015); *In re Gray*, 530 B.R. 501, 502 (Bankr. S.D. Fla. 2015); *Fed. Nat'l Mortg. Assoc. v. Griffin (In re Griffin)*, 489 B.R. 638, 643 (Bankr. D. Md. 2013); *In re Domingue*, No. 11-40437, 2012 WL 3961212, at *2–3 (Bankr. S.D. Tex. Sept. 10, 2012); *In re Evans*, No. 11-80123, 2011 WL 1420887, at *2 (Bankr. M.D.N.C. Apr. 11, 2011); *In re Brown*, 428 B.R. 672, 677 (Bankr. D.S.C. 2010); *In re Carter*, No. 09-35587, 2009 WL 5215399, at *3–4 (Bankr. S.D. Tex. Dec. 28, 2009); *In re Newberry*, No. 07-10170, 2007 WL 2029312, at *2 (Bankr. D. Vt. July 10, 2007).[9] And a leading treatise unconditionally declares, "Reverse mortgages that have matured due to the death of the original mortgagor can . . . be modified under section 1322(c)(2)." 8 *Collier on Bankruptcy* ¶1322.17 (Richard Levin & Henry J. Sommer eds., 16th ed. 2021), LexisNexis; see also W. Homer Drake, Jr., et al., *Chapter 13 Practice & Procedure* §5:41 n.4 (2021), Westlaw CHAP13PP (collecting cases concluding that §1322(c)(2) permits the modification of a claim secured by "property subject to [a] matured reverse mortgage").

Reverse Mortgage contends that this uniform conclusion cannot be reconciled with decisions, such as *In re Anderson*, 458 B.R. 494 (Bankr. E.D. Wis. 2011), that reason that §1322(c)(2) does not apply when the maturity of a secured debt is accelerated due

---

[9] Reverse Mortgage seeks to distinguish *Brown* because, although the court concluded that §1322(c)(2) applied, the plan in that case paid the full amount of debt rather than a lesser value of the securing property. ECF No. 26, at 9. That distinction makes no difference. Section 1322(c)(2) provides that, if a claim falls within its scope, "the plan may provide for the payment of the claim as modified pursuant to [11 U.S.C. §]1325(a)(5)". Section 1325(a)(5) permits the debtor, "with respect to [an] allowed secured claim provided for by the plan", to pay "the allowed amount of such claim", assuming other payment and lien-retention requirements are also met. §1325(a)(5)(B)(ii). For purposes of this provision, the amount of an allowed secured claim is governed by §506(a). *Assocs. Com. Corp. v. Rash*, 520 U.S. 953, 956–57 (1997). Section 506(a) provides, in relevant part, "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim [only] to the extent of the value of such creditor's interest in the estate's interest in such property". Thus, if the value of the property securing a creditor's claim exceeds the amount of the claim, as in *Brown*, then a plan invoking §1322(c)(2) may nevertheless have to provide for full payment of the claim. If, instead, the amount of the claim exceeds the value of the property, as is the case here, then the debtor can use §1325(a)(5)(B)'s "cram down power" and "keep the property over the objection of the creditor" by paying the creditor the amount of its secured claim under §506(a), i.e., the value of the property securing its claim. *Rash*, 520 U.S. at 957.

to a default by the borrower. See *id.* at 502–03. *Anderson*, like similar cases, reasons that "accelerat[ion] by default . . . creates a new due date" for payments, "but it does not change the *original* date" for purposes of §1322(c)(2). *Id.* at 503; see also *In re Rowe*, 239 B.R. 44, 53 (Bankr. D.N.J. 1999) (concluding that §1322(c)(2) does not apply where a claim's "natural maturity date extends beyond the life of the . . . [p]lan").

Reverse Mortgage attempts to make cases like *Anderson* relevant by casting all the maturity-triggering events specified in the note and mortgage as defaults, including the death of the borrower. See, e.g., ECF No. 26, at 7 (describing "the death of the borrower" as "an unresolvable default"). This approach disregards the plain meaning of "default", which is "[t]he omission or failure to perform a legal or contractual duty". *Black's Law Dictionary* 526 (11th ed. 2019); see also *Webster's Third New International Dictionary* 590 (defining "default" in relevant part as a verb meaning "to fail to fulfill a contract or agreement . . . or to perform a duty" or "to fail to perform, pay, or make good"). And Reverse Mortgage's conflation of all such events is untenable given the terms of the note and mortgage, which clearly single out true defaults, providing for acceleration, though only with HUD's approval, if "[a]n obligation of the Borrower under [the mortgage] is not performed." Claim No. 2, at 10 & 16.

The borrower's death did not breach or leave unperformed any obligation under the mortgage; it was an anticipated outcome by which the debt matured. See *Michaud*, 548 B.R. at 584 ("The death of the borrower is the predicted event at the heart of a reverse mortgage; it is not the same as a borrower defaulting . . . ."). The intention of the parties, as objectively manifested in the note and mortgage, was that the death of the borrower (or the sale of the property) would *fix* the maturity of the debt, not *accelerate* it. In other words, the parties to the note and mortgage intended and expected that the debt would be repaid when the borrower died (or the property was sold). When that happened, the due date of "the last payment under the original payment schedule", which had been contingent, was fixed. That fixed date precedes the date on which the

final payment under the plan is due, so the plan can modify Reverse Mortgage's claim under §1322(c)(2).

IV

Reverse Mortgage alternatively argues that the court cannot permit the plan to modify its claim under §1322(c)(2) because the debtor would then be afforded greater rights under the plan than he would have under nonbankruptcy law, "contrary to Federal Law and Congressional purpose." ECF No. 26, at 6 (citing *LaGrone v. LVNV Funding LLC (In re LaGrone)*, 525 B.R. 419, 424 (Bankr. N.D. Ill. 2015)). Reverse Mortgage asserts that the plan proposes the "modification"—indeed, the "abrogat[ion]"—"of [its] rights outside of what is specifically allowed in . . . § 506", contrary to the Supreme Court's decision in *Nobelman v. American Savings Bank*, 508 U.S. 324, 326 (1993), and that confirming it is beyond the power of this court because "[a] bankruptcy court may not create substantive rights that are otherwise unavailable under applicable law." *Id.* (citing *In re Geneva ANHX IV LLC*, 496 B.R. 888, 901–02 (Bankr. C.D. Ill. 2013)).[10]

Reverse Mortgage offers these arguments in support of its objection to plan confirmation, but it fails to identify any provision of §1325 (the section of the Bankruptcy Code that governs confirmation of chapter 13 plans) to which these arguments relate. That is reason enough to disregard them. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman–Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). These arguments also fail on the merits, however, because the plan

---

[10] The portion of *Geneva* cited by Reverse Mortgage addresses whether a bankruptcy court may, without any specific authorization in the Bankruptcy Code, use its equitable power, pursuant to 11 U.S.C. §105(a), to order "substantive consolidation" and thereby "force an unwilling non-debtor entity to merge its assets into a bankruptcy estate". See 496 B.R. at 900–02. *Geneva* concludes that this "proposed use of substantive consolidation . . . is improper and impermissible", citing the "narrow view of a bankruptcy court's use of its equity power" taken by the Seventh Circuit and explaining that "[b]ankruptcy courts are not permitted in the name of equity" to afford debtors "property rights or remedies" that are not "statutorily authorized under the Bankruptcy Code." *Id.* at 901–02. Here, the Bankruptcy Code explicitly permits what the plan proposes, so *Geneva* is inapposite.

offends neither of the only two conceivably relevant confirmation requirements: (1) that the plan must comply with the provisions of chapter 13 and any "other applicable provisions" of the Bankruptcy Code and (2) that the plan must have "been proposed in good faith and not by any means forbidden by law". §1325(a)(1) & (3).

A

In *Nobelman*, the Court considered "whether § 1322(b)(2) prohibits a Chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence" and "conclude[d] that it does". 508 U.S. at 325–26. In doing so, the Court acknowledged §1322(b)(5), which "permits the debtor to cure prepetition defaults on a home mortgage by paying off arrearages over the life of the plan 'notwithstanding' the exception in § 1322(b)(2)", as a "statutory limitation[]" that is "outside § 1322(b)(2)'s prohibition." *Id.* at 330. The Court did not mention §1322(c)(2), another such limitation applicable "[n]otwithstanding subsection (b)(2)", but that is no surprise: *Nobelman* was decided more than a year before §1322(c)(2) was enacted, in its current form, as another exception to §1322(b)(2). See 508 U.S. 324; see also Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, §301(2), 108 Stat. 4106, 4131.

In this case, although §1322(b)(2) would otherwise prohibit the modification of Reverse Mortgage's rights as a claim holder, the plan's proposed treatment of its claim is authorized by §1322(c)(2). Section 1322(c)(2) permits the plan to "provide for the payment of the claim as modified pursuant to section 1325(a)(5)", and again, §1322(c) expressly states that the plan may do that "[n]otwithstanding" §1322(b)(2). The plan invokes the "cram down option" specified in §1325(a)(5)(B), under which "the debtor is permitted to keep the property" if, among other things, he is required to pay the creditor the amount of its secured claim under §506, i.e., the value of the property securing the claim. *Rash*, 520 U.S. at 957. Reverse Mortgage does not dispute that the plan requires the debtor to pay it that amount.

B

Reverse Mortgage also argues that confirmation of the plan would "[p]reempt and [d]efeat 24 C.F.R. §206.1". ECF No. 26, at 5–7. Congress enacted 12 U.S.C. §1715z-20, and HUD promulgated corresponding regulations, including §206.1, to address "the special needs of elderly homeowners"—who face "increasing costs of meeting health, housing, and subsistence needs at a time of reduced income"—by insuring home equity conversion mortgages, "to encourage and increase the involvement of mortgagees and participants in the mortgage markets in the making and servicing of [such] mortgages" and thereby "permit the conversion of a portion of accumulated home equity into liquid assets". See §1715z-20(a)(1) & (2). Many of the rules of the resulting program are discussed in detail above.

The upshot, from Reverse Mortgage's perspective, seems to be that confirming the plan would confer on the debtor benefits available under the home equity conversion mortgage program for which he is ineligible and to which he is not entitled, while also denying Reverse Mortgage its rights under the program, including the right to foreclose the mortgage now that the borrower has died, thereby subverting the program that Congress and HUD fashioned to assist elderly homeowners.

Nothing suggests, however, that Congress intended to limit §1322(c)(2)'s applicability to home equity conversion mortgages. If anything, the laws themselves suggest the opposite: Section 1715z-20 was enacted in February 1988. §417(a), 101 Stat. at 1908–12. HUD first promulgated corresponding regulations the following year. *Home Equity Conversion Mortgage Insurance*, 54 Fed. Reg. 24822 (June 9, 1989). Then, several years passed before §1322(c)(2), in its current form, was enacted, in October 1994. §301(2), 108 Stat. at 4131. And, notably, §1322(c)(2) operates, by the express terms of §1322(c), "[n]otwithstanding . . . applicable nonbankruptcy law". In other words, Congress enacted §1322(c)(2), permitting chapter 13 plans to modify certain claims secured by residential mortgages without regard to any nonbankruptcy law that might

otherwise apply, against the then-existing legal backdrop, which had, for years, included §1715z-20 and the home equity conversion mortgage program's rules.

Besides, nothing suggests that §1322(c)(2) and §1715z-20 are irreconcilable such that the court cannot "regard each as effective". See *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Section 1715z-20 governs only whether HUD may insure repayment of a debt secured by a given mortgage. It does not mandate any particular terms to which a lender and borrower must agree. See *Est. of Jones v. Live Well Fin., Inc.*, 902 F.3d 1337, 1339 (11th Cir. 2018) ("Because the statute addresses and limits only the Secretary's authority—specifying the types of mortgages that HUD 'may not insure'—it does not alter or affect the rights that a [party] independently possesses under a reverse-mortgage contract."). As a result, that §1322(c)(2) permits the plan's modification of the claim, including the repayment terms specified in the note and mortgage, does not make that statute irreconcilable with §1715z-20. Simply put, §1322(c)(2) and §1715z-20 "are capable of co-existence". See *Morton*, 417 U.S. at 551. If one's allowances undercut the other's goals, Congress must rebalance the relevant interests and amend the statutes accordingly.

V

For these reasons, it is ordered that Reverse Mortgage's objection to confirmation of the plan is overruled.

# # # # #